The uncontroverted medical evidence shows that plaintiff suffered from tenosynovitis, a disease or condition deemed by statute to be an occupational disease when "caused by trauma in employment". N.C. Gen. Stat. § 97-53(21). Dr. McGinnis treated her for a "trigger thumb" condition, which results when swelling of the flexor tendon prevents normal motion of the thumb, causing it to become "locked" into a very limited range of motion. The condition can be caused or aggravated by repetitive trauma or overuse. Plaintiff testified that her thumb "had been sore, off and on" before going to work with the defendant, and that she had seen a doctor about the problem 11 months before her referral to the surgeon, but that pinching and holding the thinner cloth used at Valley Tex caused it to get worse rapidly. After working there only seven days, she visited Dr. Kessel, who referred her to the hand surgeon. Dr. McGinnis first treated it with an injection but later resorted to release surgery to relieve the condition. In light of her medical history, both Drs. Kessel and McGinnis testified that the condition was not initially caused by her employment with the defendant, but was aggravated by it. On cross-examination, defendants elicited this answer from Dr. McGinnis, with a hypothetical question stressing her prior symptoms: "In light of that other information, a job probably did not aggravate it any more than it was with the history of previous locking on multiple occasions." (Emphasis ours.) Even taking this statement as literally true, the employment in which plaintiff experienced the last injurious "exposure which proximately augmented the disease to any extent, however slight" bears the compensation liability. Barber v.Babcock Wilcox Constr. Co., 101 N.C. App. 564,400 S.E.2d 735 (1991); N.C. Gen. Stat. § 97-57.
Upon review of all of the competent evidence of record with reference to the errors assigned, and finding good ground to reconsider the evidence, the Full Commission REVERSES the decision under review, and makes findings and conclusions as follows:
The Full Commission finds as fact and concludes as matters of law the following stipulations, which were entered into by the parties in the Pre-Trial Agreement filed on July 26, 1995.
STIPULATIONS
1. The parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act, and the employment relationship existed between the parties at the relevant time.
2. Harleysville Insurance Company was the carrier on the risk.
3. The issue for determination is whether the plaintiff contracted a compensable occupational disease to her right hand, and if so, to what benefits may she be entitled to receive under the Act.
4. The parties stipulated the following into evidence:
 a. Employee's Interrogatory Answers, eighteen pages;
 b. Records of Dr. Wayne Boyles and Dr. John Kessel, ten pages;
c. Records of Dr. Mark McGinnis, five pages;
d. Form 22, one page;
 e. Records of Betty's Toe Seaming and Southwood Furniture, two pages; and
 f. Defendant's Exhibit No. 1, Plaintiff's Application to Southwood Furniture Company.
5. The plaintiff's average weekly wage was $163.88, which yields a weekly compensation rate of $108.93.
* * * * * * * *
Based upon all of the competent evidence adduced from the record, the Full Commission makes the following:
FINDINGS OF FACT
1. At the time of the hearing, the plaintiff was a forty-seven year old right hand dominant female.
2. On November 10, 1993, the plaintiff was seen by her family doctor, Dr. Wayne Boyles, for a triggered right thumb or tendonitis, for which medication was prescribed.
3. The plaintiff worked at Century Furniture as a hand sander in 1994 during which time she experienced some problems with the right thumb. The plaintiff left this job in June of 1994, and thereafter the thumb condition improved.
4. The plaintiff was self-employed as a toe seamer in November of 1993. Thereafter, the plaintiff worked at Betty's Toe Seamers, Edelweiss, and U.S. Hosiery, performing toe seaming for approximately three months prior to the job with the defendant.
5. From September 26, 1994, through October 31, 1994, the plaintiff began working for defendant-employer as a toe seamer. The plaintiff made repetitive use of her hands, grasping and pulling socks for seaming. The plaintiff sewed between 120 and 150 dozen pairs of sock per day, or approximately 2,880 socks. Her job with defendant put more stress on her thumb because it required pinching and pulling on nylon, as opposed to thicker stockings with more cotton content.
6. As a result of the repetitive use of her hands in this employment, the plaintiff began to experience right thumb pain and locking in September of 1994. On or about October 7, 1994, the plaintiff was seen by Dr. John Kessel, who subsequently referred her to hand surgeon Dr. Mark McGinnis.
7. The plaintiff reported her hand problems to her supervisor while working for the defendant.
8. On October 12, 1994, the plaintiff saw Dr. McGinnis who noted the right thumb was locked to twenty percent of normal motion because of stenosing synovitis. On November 3, 1994, Dr. McGinnis performed a right trigger thumb release surgery, following which the plaintiff was restricted to no work through November 7, 1994.
9. Effective November 8, 1994, Dr. McGinnis released the plaintiff to light duty, and the plaintiff telephoned plant manager Eddie Warren, to advise that she could no longer work as a toe seamer with the defendant. The plaintiff did not request other work from Mr. Warren.
10. Dr. McGinnis released the plaintiff to her usual work on November 28, 1994. However, the plaintiff did not contact defendant-employer regarding returning to work.
11. The plaintiff's tenosynovitis and resulting right trigger finger condition was significantly aggravated and accelerated by her toe seaming work with defendant-employer, causing her to become incapacitated to earn wages on November 1, 1994, and necessitating surgery.
12. That, in fact, plaintiff's condition was characteristic of or particular to her employment, in that the repetitive nature of plaintiff's job with defendant-employer, which significantly augmented the condition, exposed her to a greater risk of contracting or exacerbating tenosynovitis than the general run of occupations and the public generally.
13. The plaintiff's occupational disease, tenosynovitis, was proximately augmented during her last injurious exposure to the hazards of the disease in her job with defendant-employer.
14. Following surgery on November 3, 1994, plaintiff was restricted to "no work" through November 7, 1994. On November 8, 1994, Dr. McGinnis said that plaintiff "may work with minimal use of the right hand. She should not lift over 1 lb. with the right hand. Her activities should be severely restricted in regard to the use of the right hand at this time." On November 11, 1994, Dr. McGinnis prescribed ". . .light duty work[,] limited use of the right hand with limited pinching, pulling, and grasping. She is not to lift over 5 lbs. with the right hand." On November 25, 1994, Dr. McGinnis said plaintiff, "May return to her usual work on November 28, 1994" and that ". . . she should not be lifting over 50 lbs. over the next four weeks, but she may otherwise do her regular job." As a result of impairment due to the occupational disease, and her vocational background, plaintiff was unable to earn wages until January 5, 1995.
15. Dr. McGinnis's notes for plaintiff's visit to him on January 4, 1995 reflect that he had "sent her to therapy to work with ultrasound, iontophoresis, and other modalities to try to decrease the sensitivity of the right thumb metacarpophalangeal joint." He also told plaintiff that "it may be advisable to look for a job that does not require as much use of her thumb." Because plaintiff knew of the jobs available with the defendant and their requirements, she concluded that she could not return to work there. She did not communicate with the defendant about the availability of any work, but began submitting applications to alternative employers.
16. Plaintiff testified to having pursued employment with at least eight major employers without much success. (Tr., pps. 19-20, etc.). However, she found part-time work at Betty's Toe Seaming beginning January 5, 1995, as a "floor lady, supervisor" where she worked for $25.00 a day for a five-hour day until she obtained employment at Southern Furniture in May, 1995. There,. she worked for $6.50 an hour for an eight-hour day. This employment lasted only for two weeks, ending when the employer required all workers to increase their work days to ten hours. (Tr., pp. 22, 42-44, and 55.) Plaintiff could not work a ten-hour day, and she returned to her part-time job at Betty's Toe Seaming, which did not require much use of her thumb, where she continued to work up until the time of the hearing before the Deputy Commissioner.
17. Due to efforts to obtain employment and wages commensurate with her capacity, plaintiff earned an average weekly wage of $143.21 from January 5, 1995 through the date of the hearing, which fairly reflects her wage-earning capacity, rendering a compensation rate for ongoing temporary partial disability of $13.78 per week.
18. At the time of the hearing before the Deputy Commissioner, it remained unsettled whether or how much permanent partial disability plaintiff retained due to the occupational disease.
* * * * * * * *
Based upon the foregoing findings of fact, the Full Commission enters the following:
CONCLUSIONS OF LAW
1. The plaintiff was disabled by tenosynovitis, a statutorily-recognized occupational disease, caused by repetitive trauma in defendant's employment, beginning in October, 1994. N.C. Gen. Stat. § 97-53(21).
2. Plaintiff's activities in her employment with the defendant augmented and accelerated her pre-existing tenosynovitis, causing the condition to develop to the extent that it disabled her. Plaintiff's employment with the defendant exposed her to a greater risk of contracting tenosynovitis than are persons in the general run of employments or the public generally. N.C. Gen. Stat. § 97-53(13); Rutledge v. Tultex Corp.,308 N.C. 85, 93-94 and 102, 301 S.E.2d 359 (1983); Wilkins v. J.P.Stevens Co., 333 N.C. 449, 426 S.E.2d 675 (1993).
3. Plaintiff was last injuriously exposed to the hazards of tenosynovitis in her employment with the defendant, which proximately augmented and accelerated her pre-existing tenosynovitis, causing it to develop into a disabling condition. N.C. Gen. Stat. § 97-57; Rutledge, at 89.
4. As a result of the occupational disease, plaintiff was temporarily totally disabled after October 31, 1994 through January 5, 1995 and temporarily partially disabled thereafter, despite reasonable efforts to gain and keep full-time employment. N.C. Gen. Stat. §§ 97-29; 97-30.
5. It had not been determined whether or not the plaintiff has suffered any permanent partial disability at the time the record was closed, and further medical examination will be necessary to make this determination. The plaintiff's election between disability benefits provided for under G.S. Gen. Stat. §§ 97-30 and 97-31 must await that determination. Crawley v.Southern Devices, Inc., 31 N.C. App. 284 at 289, 229 S.E.2d 325
(1976); and Gupton v. Builders Transport, 320 N.C. 38, at 42,357 S.E.2d 674 (1987).
* * * * * * * *
Based upon the foregoing findings of fact and conclusions of law, the Full Commission reverses the holding of the Deputy Commissioner and enters the following:
AWARD
1. Defendants shall pay plaintiff temporary total disability benefits at the rate of $108.93 per week for the period November 1, 1994 through January 4, 1995; in one lump sum, subject to the attorney's fee hereinafter approved.
2. Defendants shall pay plaintiff, at her election, either such permanent partial disability benefits, if any, which are due by agreement of the parties or further order of the Commission; or temporary partial disability benefits at the rate of $13.78 beginning January 5, 1995 and continuing for up to 300 weeks from the date of the injury, subject to the attorney's fees hereinafter awarded.
3. Defendants shall pay all medical compensation expenses resulting from the plaintiff's occupational disease of tenosynovitis commencing with her visit to Dr. McGinnis on October 12, 1994, when bills for same have been submitted to the carrier and approved in accordance with the rules of the Commission.
4. A reasonable attorney's fee equal to 25% of the compensation awarded herein is approved for plaintiff's counsel, and the carrier shall pay directly to counsel 25% of the accrued benefits awarded and elected by the plaintiff, and each fourth future check for compensation paid without contest as a result of this award.
5. Defendants shall pay all costs due the Commission associated with this case, and shall pay an expert witness fee of $170.00 to Mark McGinnis, M.D.
 S/ __________________ J. RANDOLPH WARD COMMISSIONER
CONCURRING:
S/ __________________ J. HOWARD BUNN, JR. CHAIRMAN
S/ ___________________ BERNADINE S. BALLANCE COMMISSIONER
JRW:md